# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF OHIO

|  |  |
|---|---|
| JOSEPH MANSOUR, derivatively on behalf of CLIFFS NATURAL RESOURCES INC., | :    Civil Action No. |
| Plaintiff, | : |
| v. | : |
| JOSEPH A. CARRABBA, GARY B. HALVERSON, LAURIE M. BRLAS, TERRANCE M. PARADIE, DAVID B. BLAKE, SUSAN M. CUNNINGHAM, JANICE K. HENRY, BARRY J. ELDRIDGE, MARK E. GAUMOND, ANDRÉS R. GLUSKI, SUSAN M. GREEN, JAMES F. KIRSCH, STEPHEN M. JOHNSON, RICHARD K. RIEDERER and TIMOTHY W. SULLIVAN, | : **JURY TRIAL DEMANDED** |
| Defendants, | : |
| and | : |
| CLIFFS NATURAL RESOURCES INC., | : |
| Nominal Defendant. | : |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1.      Plaintiff Joseph Mansour ("Plaintiff"), by and through his undersigned attorneys, hereby submits this Verified Shareholder Derivative Complaint (the "Complaint") for the benefit of nominal defendant  Cliffs Natural Resources Inc. ("Cliffs" or the "Company") against certain members of its Board of Directors (the "Board") and executive officers seeking to remedy defendants' breaches of fiduciary duties and unjust enrichment from 2012 to the present (the "Relevant Period").  The allegations herein are based off of Plaintiff's own knowledge, the research of his attorneys, and the allegations outlined in the federal securities class action against Cliffs and certain other defendants, captioned *The Dept. of the Treasury of the State of New Jersey and Its Division of Investment v. Cliffs Natural  Resources, Inc., et. al.*, Case No. 14-cv-1031 (N.D.

Ohio) (the "Securities Class Action").

## NATURE OF THE ACTION

2.      According to its public filings, headquartered in Cuyahoga County, Ohio, Cliffs is an international mining and natural resources company that derives substantially all of its revenue from the production and sale of iron ore and coal.  Cliffs' strategy is to continually achieve greater scale and diversification in the mining industry through a focus on serving the world's largest and fastest growing steel markets.  The Company's business is divided among several segments, one of the most significant of which is "Eastern Canadian Iron Ore," a substantial contributor to Cliffs' earnings and a critical component of the Company's growth strategy. The Eastern Canadian Iron Ore segment is principally comprised of two mines: Bloom Lake ("Bloom Lake"), located in Quebec, Canada, and Wabush, situated in Wabush, Newfoundland and Labrador, Canada.  Iron ore produced from these mines is primarily sold to steel producers in Asia.

3.      Cliffs obtained a 75% interest in Bloom Lake when it acquired Consolidated Thompson Iron Mines Limited ("Consolidated Thompson") in May 2011.  Defendants caused the Company to pay nearly $5 billion to acquire Consolidated Thompson, whose principal asset was its interest in Bloom Lake.  That transaction was Cliffs' largest acquisition ever.  At the time of the transaction, Bloom Lake consisted of one billion tons of resources, a concentrator to process the ore, as well as rail and port facilities to transport the ore.  Defendants termed this baseline state, which could produce 8.0 million metric tons of iron ore annually, "Phase 1."  In order to execute the Company's growth strategy and justify the price it paid for Bloom Lake, Defendants were intent on substantially increasing production at the mine through two phases of expansion – Phase 2, which would double annual production capacity from 8.0 million metric tons to 16.0 million metric tons, and an exploratory Phase 3, which would further increase annual production to 24.0

million metric tons.

4.     Throughout the Relevant Period, the defendants misrepresented that Bloom Lake was a premium asset given its established rail and port infrastructure and "fantastic" facilities, and as such, that production could be increased even as production costs decreased.  The defendants also made misleading statements regarding the sustainability of the Company's dividend, which the defendants had caused Cliffs to dramatically increase by 123% on March 14, 2012.  Notwithstanding that the defendants lacked the ability to properly test the dividend and Bloom Lake was suffering from a raft of undisclosed problems, the defendants repeatedly touted that the Company's dividend was "extremely sustainable" and "tested [under] a wide variety of [iron ore] pricing scenarios."

5.     The defendants were on notice of the systemic problems with Bloom Lake's facilities that caused massive cost overruns and serious production issues, yet never disclosed these facts.  These problems made it impossible for Cliffs to produce ore from Bloom Lake at low costs or to maintain the Company's dividend. The true facts were that: (i) Bloom Lake's facilities had serious problems, including inadequate equipment and shipping facilities that were incapable of efficiently transporting iron ore products; (ii) the mining operation of Bloom Lake would be more expensive than disclosed, including that the production cost of iron ore per ton had increased and could not be decreased, as a result of the Company's reliance on contract labor and a failure to efficiently manage the operation; (iii) production volumes at Bloom Lake had decreased rather than increased; (iv) the Phase 2 and Phase 3 projects designed to increase production at Bloom Lake were not economically viable; (v) as a result of the systemic and persistent problems at Bloom Lake, the Company's dividend was not sustainable; and (vi) the defendants were incapable of adequately testing the dividend.

6.     Through November 2012, the defendants provided assurances that production at Bloom Lake would increase and that they would reduce costs at the mine. Notwithstanding these assurances, however, during 2012 the defendants caused the Company to report increased costs and decreased production at Bloom Lake.

7.     On November 19, 2012, the defendants announced significant adjustments to the Company's 2013 operating plan, effectively admitting that the Bloom Lake project was encountering serious problems.  These adjustments included a suspension of key components of the Phase 2 expansion at Bloom Lake, and a delay of Cliffs' Phase 3 study.  Defendants however, continued to conceal the full extent of the issues at the mine as well as the fact that they knew that under their direction and on their watch, Cliffs' dividend was not sustainable.  The next day, Goldman Sachs cut its rating on Cliffs' stock, citing Bloom Lake's expansion delay, high production costs, as well as concerns regarding the Company's ability to continue paying its dividend.  On this news, the price of Cliffs' stock dropped from $36.60 per share on November 19, 2012 to close on $30.48 per share on November 20, 2012, or over 16.7%.

8.     On February 12, 2013, after the financial markets had closed, the defendants announced that they would slash the Company's dividend by 76% to $0.15 per share. Significantly, this announcement came less than one year after the defendants had caused Cliffs to more-than-double its dividend and after repeated assurances that the dividend had been tested and was sustainable.  The next day, the defendants stated during the Company's fourth quarter 2012 earnings conference call that Bloom Lake's costs remained elevated at $86 per ton.  These disclosures caused the price of Cliffs' stock to drop over 20.7%, or $7.59 per share, from $36.61 per share on February 12, 2013 to $29.02 per share on February 13, 2013.

9.     Finally, on March 27, 2013, Morgan Stanley and Credit Suisse severely cut their

price targets on Cliffs' stock, citing a weak balance sheet, the potential need to sell core assets, structural changes in its business and increased costs. On this news, the price of Cliffs' stock declined from $21.43 per share on March 26, 2013, to $18.46 per share on March 27, 2013 or almost 13.9 %.

10.     On July 9, 2013, the defendants caused Cliffs to announce that its Chief Executive Officer ("CEO"), defendant Joseph A. Carrabba ("Carrabba"), had resigned as Chairman; Carrabba also resigned as President, CEO and a Director of the Company effective November 15, 2013. Defendants also caused the Company to announce on July 9, 2013 that its Executive Vice President ("EVP") and President of Global Operations, defendant Laurie M. Brlas ("Brlas"), would leave Cliffs immediately. On August 21, 2013, Cliffs announced that Defendant Blake would resign effective October 31, 2013.

11.     Accordingly, as a result of defendants' breaches, the Company has been damaged.

12.     As a result of the allegations set forth herein, on May 30, 2014, Plaintiff issued a demand pursuant to Ohio law (the "Demand") on the Board to investigate and commence an action against certain current and/or former directors and executive officers of the Company (*i.e.* the defendants named herein). A true and correct copy of the Demand is attached hereto at Exhibit A. The Demand was sent via certified mail and received by the Company on June 2, 2014. *Id.*

13.     It has now been over twenty-one months since Plaintiff issued the Demand and Plaintiff has received no substantive response whatsoever.

14.     Clearly, the Board's complete disregard of the Demand, which resulted in its functional refusal, is improper and demonstrates the Board's lack of diligence and good faith.

15.     In a February 7, 2016 press release, the Company announced that it had entered into an agreement in principle to settle certain derivative claims based on similar allegations

through three derivative actions filed in Court of Common Pleas of Cuyahoga County, Ohio (the "State Derivative Actions"). Each plaintiff in the State Derivative Actions, unlike Plaintiff, ran afoul of Ohio law by failing to make a pre-suit demand on the Board prior to filing their respective actions. The State Derivative Actions were stayed for nearly eighteen months before the announcement of the proposed settlement.

16. Meanwhile, the Board continues to ignore the Demand and is now seeking to obtain a release of Plaintiff's claims set forth herein from shareholders who, unlike Plaintiff, failed to comply with Ohio law. Thus, this shareholder derivative action should be allowed to proceed.

## JURISDICTION AND VENUE

17. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) in that Plaintiff and defendants are citizens of different states and the matter in controversy exceeds $75,000.00, exclusive of interests and costs. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367(a). This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

18. Venue is proper in this district because a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, occurred in this district. One or more of the defendants either resides in or maintains executive offices in this district, and defendants have received substantial compensation in this district by engaging in numerous activities and conducting business here, which had an effect in this district.

## THE PARTIES

19. Plaintiff is a current shareholder of Cliffs and has continuously held Cliffs stock since March 2011. Plaintiff is a citizen of Nevada.

20.     Nominal defendant Cliffs is an Ohio corporation, with its principal executive offices at 200 Public Square, Cleveland, Ohio, 44114-2315.  According to its public filings, Cliffs is an international mining and natural resources company.  The Company is a major global iron ore producer and a significant producer of high-and low-volatile metallurgical coal. Cliffs' strategy is to continually achieve greater scale and diversification in the mining industry through a focus on serving the world's largest and fastest growing steel markets.

21.     Defendant Carrabba served as the Company's CEO from September 2006 until December 31, 2013, as President from May 8, 2005 until November 18, 2013, and as the Chairman of the Board from May 8, 2005 until July 9, 2013.  On July 9, 2013, it was announced that Carrabba had "resigned" as Chairman.  Upon information and belief, defendant Carrabba is a citizen of Florida.

22.     Defendant Gary B. Halverson ("Halverson") served as the Company's CEO from February 2014 until August 2014, as President from November 2013 until August 2014, as the Chief Operating Officer from November 2013 until February 2014, and as a director of the Company from November 2013 until August 2014.  Upon information and belief, defendant Halverson is a citizen of Utah.

23.     Defendant Brlas served as the Company's President of Global Operations from October 2012 until July 2013, as an EVP of Global Operations from March 2008 until July 2013, as the Chief Financial Officer ("CFO") from December 2006 until October 2012, as EVP of Finance & Administration from July 2012 until October 2012, as Senior Vice President ("SVP") from December 11, 2006 until 2007, and as Treasurer from December 11, 2006 until October 2007.  On July 9, 2013, it was announced that Brlas had "retired" and left the Company effective immediately.  Upon information and belief, defendant Brlas is a citizen of Florida.

24.     Defendant Terrance M. Paradie ("Paradie") served as the Company's CFO from October 2012 until March 2015, as EVP from March 2013 until March 2015, as Treasurer from September 2014 until February 2015, as Assistant General Manager of Michigan Operations for Cliffs Global Operations Group from March 2012 until September 2012, as Chief Accounting Officer ("CAO") from July 2009 to March 2012, as SVP from January 2011 until March 2013, as Vice President from October 2007 until January 2011, and as Corporate Controller from October 2007 until March 2012.  Upon information and belief, defendant Paradie is a citizen of Ohio and Florida.

25.     Defendant David B. Blake ("Blake") served as the Company's SVP of Eastern Canadian Iron Ore Operations from March 2009 until October 2013, as SVP, North American Iron Ore Operations from November 2007 until 2009.  On August 21, 2013, it was announced that Blake would "resign" effective October 31, 2013.  Upon information and belief, defendant Blake is a citizen of Florida.

26.     Defendant Susan M. Cunningham ("Cunningham") served as a director of the Company from September 2005 until August 2014.  In addition, defendant Cunningham served as a member of the Board's Strategy and Sustainability Committee (the "Strategy Committee") during the Relevant Period.  Upon information and belief, defendant Cunningham is a citizen of Texas.

27.     Defendant Janice K. Henry ("Henry") served as a director of the Company from September 2009 until October 2014.  In addition, defendant Henry served as Chair of the Board's Audit Committee (the "Audit Committee") during the Relevant Period.  Upon information and belief, defendant Henry is a citizen of North Carolina.

28.     Defendant Barry J. Eldridge ("Eldridge") served as a director of the Company from

July 2005 until July 2014.  In addition, defendant Eldridge served as a member of the Strategy Committee during the Relevant Period.  Upon information and belief, defendant Eldridge is a citizen of Australia.

29.     Defendant Mark E. Gaumond ("Gaumond") served as a director of the Company from July 2013 until September 2014.  In addition, defendant Gaumond served as a member of the Audit Committee during the Relevant Period.  Upon information and belief, defendant Gaumond is a citizen of California.

30.     Defendant Andrés R. Gluski ("Gluski") served as a director of the Company from January 2011 until August 2014.  In addition, defendant Gluski served as a member of the Audit Committee and the Strategy Committee during the Relevant Period.  Upon information and belief, defendant Gluski is a citizen of the District of Columbia.

31.     Defendant Susan M. Green ("Green") has served as a director of the Company since 2007.  In addition, defendant Green served as a member of the Audit Committee during the Relevant Period.  Upon information and belief, defendant Green is a citizen of Maryland.

32.     Defendant James F. Kirsch ("Kirsch") served as the non-executive Chairman of the Board from July 2013 until January 2014, as an Executive Chairman from January 2014 until May 2014, again as non-executive Chairman from May 2014 until August 2014, as a director from March 2010 until November 2013 and as Lead Director from June 2013 until August 2014.  Upon information and belief, defendant Kirsch is a citizen of Michigan.

33.     Defendant Stephen M. Johnson ("Johnson") served as a director of the Company from September 2013 until August 2014.  In addition, defendant Johnson served as a member of the Audit Committee during the Relevant Period.  Upon information and belief, defendant Johnson is a citizen of Texas.

34.     Defendant Richard K. Riederer ("Riederer") served as a director of the Company from 2002 until September 2014.  In addition, defendant Riederer served as a member of the Strategy Committee during the Relevant Period.  Upon information and belief, defendant Riederer is a citizen of Wisconsin and Arizona.

35.     Defendant Timothy W. Sullivan ("Sullivan") served as a director of the Company from January 2013 until August 2013.  In addition, defendant Sullivan served as a member of the Strategy Committee during the Relevant Period.   Upon information and belief, defendant Sullivan is a citizen of Wisconsin.

36.     Collectively, defendants Carrabba, Halverson, Brlas, Paradie, Blake, Cunningham, Henry, Eldridge, Gaumond, Gluski, Green, Kirsch, Johnson, Riederer and Sullivan shall be referred to herein as "Defendants."

37.     Collectively, defendants Gaumond, Gluski, Green, Henry and Johnson  shall be referred to as the "Audit Committee Defendants."

38.     Collectively, defendants Cunningham, Eldridge, Gluski, Riederer and Sullivan shall be referred to as the "Strategy Committee Defendants."

**DEFENDANTS' DUTIES**

39.     By reason of their positions as officers, directors, and/or fiduciaries of Cliffs and because of their ability to control the business and corporate affairs of Cliffs, Defendants owed Cliffs and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage Cliffs in a fair, just, honest, and equitable manner.  Defendants were and are required to act in furtherance of the best interests of Cliffs and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to Cliffs and its

- 10 -

shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

40.     Defendants, because of their positions of control and authority as directors and/or officers of Cliffs, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  Because of their advisory, executive, managerial, and directorial positions with Cliffs, each of the Defendants had knowledge of material non-public information regarding the Company.

41.     To discharge their duties, the officers and directors of Cliffs were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the officers and directors of Cliffs were required to, among other things:

    a. Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

    b. Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority; and

    c. When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

42.     Pursuant to the Audit Committee's Charter, the members of the Audit Committee are required, *inter alia*, to: review and discuss earnings and other material financial press release, material financial and operational reports provided to the public; review and discuss risks related to financial and accounting reporting, and the Company's policies and compliance procedures with respect to business practices and disclosures regarding internal controls; reviewing any

correspondence with regulators or governmental agencies with financial implications; reviewing the design and effectiveness of the risk management process, including the process for identifying, reporting and mitigating key risks, and advising the Board regarding compliance with applicable laws and regulations.

43.     Pursuant to the Strategy Committee's Charter. the members of the Strategy Committee are required, *inter alia*, to: review results of major projects and post-deal integration activities in the context of prior estimates; monitor the progress and implementation of the strategic plan, and present to the Board any significant issues, risks and opportunities facing the Company that are not included in the strategic plan; assist the CEO and other senior executives in determining the resources necessary for implementation and execution of Cliffs' strategic and financial plans, and assist and advise the Board regarding (among other things) the evaluation of evolving and emerging opportunities in existing and new markets, including material acquisitions and dispositions, exploration and production activities and new ventures.

## SUBSTANTIVE ALLEGATIONS

### Company Background

44.     According to its public filings, Cliffs is an international mining and natural resources company founded in 1847 that derives substantially all of its revenue from producing and selling iron ore and coal.  The Company's business is divided among several segments, including U.S. Iron Ore, Eastern Canadian Iron Ore, Asia Pacific Iron Ore, North American Coal, Latin American Iron Ore, Ferroalloys and the Global Exploration Group.  The Eastern Canadian Iron Ore business segment is of critical importance to the Company's earnings and growth strategy, accounting for approximately $1 billion of Cliffs' revenues in 2012.  The Bloom Lake and Wabush mines form the core of the Eastern Canadian Iron Ore business segment, with Bloom Lake

- 12 -

representing 63% of the total 2012 iron production for the segment.

45.     In May 2011, Defendants caused Cliffs to pay nearly $5 billion to acquire Consolidated Thompson – Cliffs' largest acquisition ever.  Through that acquisition, the Company obtained a 75% interest in Bloom Lake.  At the time of the transaction, Bloom Lake had one billion tons of ore, a concentrator to process the ore, as well as rail and port facilities to transport the ore. Defendants termed this phase of Bloom Lake "Phase 1," and stated that the mine could produce 8.0 million metric tons per year in this phase.  Given the price that Defendants caused Cliffs to pay for Bloom Lake, the Company was driven to expand production at the mine through two large additions – Phase 2 and Phase 3.  Phase 2 would double annual iron ore production capacity from 8.0 million metric tons to 16.0 million metric tons.  It would be a mirror-image expansion of Bloom Lake's current operations and involved the development of an additional concentrator and support facilities.  Phase 3 was in the exploratory phase and Defendants touted that it would add an additional 8.0 million metric tons of capacity, for a total of 24.0 million metric tons.

46.     It is clear that the Strategy Committee was charged with reviewing, monitoring and implementing the results and progress of activities resulting from the acquisition of Consolidated Thompson and the interest obtained in Bloom Lake.

47.     Soon after the acquisition, analysts raised concerns that Cliffs had overpaid for Bloom Lake.  For example, on June 22, 2011, BMO Research estimated that Cliffs paid *$2 billion too much.* In a January 26, 2012 analyst report downgrading Cliffs from "Outperform" to "Neutral," Credit Suisse similarly described Cliffs as "*having paid far too much.*"[1]  On February 16, 2012, BB&T Capital Markets observed the "*investor criticism regarding the prices and transaction multiples paid for recent acquisitions*," including Consolidated Thompson's iron mines.

---

[1] All emphasis added, unless otherwise noted.

48.     As a result of these concerns, it was critically important for Defendants to justify to investors the high price for Bloom Lake by ostensibly generating substantial returns on that investment, and convincing the market that the three-phase plan ("Three-Phase Plan") was on track.  Indeed, as RBC Capital Markets observed on January 5, 2012: "*[A]chieving full production of the first phase of the project is one of the keys to realizing full value for the acquisition of Consolidated Thompson.*"

49.     Accordingly, throughout 2011, Defendants touted Bloom Lake as a valuable asset, and emphasized their production and expansion plans for the mine.  For example, six weeks after the acquisition, during Cliffs' earnings conference call for Q2 2011, defendant Carrabba stated, Cliffs is "well on [its] way to reaching the 8 million ton annual production rate" and the Phase 2 "ramp-up to 16 million tons is also *on track* and still slated to be completed in the latter part of 2013."

50.     Defendants touted margin increases that would be achieved by reduced production costs at Bloom Lake.  For example, on October 28, 2011, during Cliffs' earnings call for Q3 2011, defendant Brlas stated: "Impressively during the third quarter, Bloom Lake contributed approximately $155 million in cash sales margin to the company's results."  On the same call, Brlas stated that cash costs at Bloom Lake would "be approximately $60 per ton by year end."

51.     Throughout the latter half of 2011 and early 2012, analysts responded positively to Defendants' representations. For example, JPMorgan Chase & Co. remarked on August 3, 2011 that Bloom Lake production would double "toward the latter part of 2013" and that the increased volume would provide additional sales margin sufficient "to pay for the [C]apex needed to expand the facility."

52.     At the same time that Defendants were promoting the Company's Three-Phase Plan,

beginning in the latter half of 2011, iron ore prices began to fall. Before the beginning of the Relevant Period, Cliffs transitioned from a business model of long-term fixed price contracts to "spot pricing" for more of its Eastern Canadian iron ore business, where pricing was determined by the market price of ore at the time of each individual shipment. Using spot pricing meant that Cliffs' financial performance was far more susceptible to a negative impact from falling iron ore prices than it had ever been before, and it was essential that Cliffs was able to accurately model the price of iron ore in order to adequately predict its cash flow.

53. Investors and analysts were concerned about the effect of falling iron ore prices on Cliffs' financial performance, which was compounded by the transition to spot pricing. For example, on October 21, 2011, Morgan Stanley cautioned investors to "*stay on the sidelines until iron ore prices stabilize.*" Six days later, Deutsche Bank warned: "Iron ore forward curves imply 2012E average prices have fallen ~$20/t (or 13%) over the past 2 months. . . . Nearly 50% of Cliff's [sic] total iron ore volumes (Canada and Asia Pacific) are now subject to spot-driven seaborne iron ore pricing for which we use iron ore forward curves as a proxy for future prices."

54. In early 2012, analysts were also concerned that Cliffs' dividend was lower than comparable companies. For example, a January 5, 2012 RBC Capital Markets report contained a graph depicting Cliffs' dividend as low for a mining company; the same RBC analysts noted positively that "Cliffs' current objective is to bring its dividend payout in line with its global peers." In other words, Defendants needed Cliffs' dividend to be on par with or greater than the dividends of its peers to compete for investors.

55. As senior executives of the Company at the time of the Bloom Lake acquisition, defendants Carrabba, Brlas, and Blake staked Cliffs' future, and their own livelihoods, on the success of the Bloom Lake acquisition. To defend their decision to acquire the mine, and assuage

investors' concerns regarding Bloom Lake's high price, the impact of falling iron ore prices on Cliffs' financial performance, and the level of the dividend, defendants Carrabba, Brlas, and Blake were motivated to justify the Bloom Lake acquisition by fabricating the success of the Three-Phase Plan and increasing Cliffs' dividend to unsustainable levels.

56.     Steve Raguz – SVP, Corporate Strategy and Communications & Chief Strategy Officer, from October 1, 2012 through May 2013, and SVP, Corporate Strategy and Treasurer, from February 1, 2011 until October 2012, who reported to Carrabba from October 1, 2012 through the end of the Class Period and to Brlas from February 2011 until October 2012 -- conducted a great deal of research that indicated a higher dividend could help Cliffs retain investors.

### Defendants' False and Misleading Statements

57.     On March 14, 2012, Defendants announced a dramatic 123% dividend increase of $0.345 per share from the previous quarterly rate of $0.28 per share to the new quarterly rate of $0.625 per share ($2.50 per share annually).  At its new annualized rate, the Company's dividend yield would be at the top of its metals and mining peer group, and near the top 10% of companies that are in the Standard & Poor's 500 Index.  In a press release announcing the dividend increase, defendant Carrabba directly linked that increase to growth from "M&A,"[2] including the Bloom Lake acquisition, and falsely stated that the successful expansion allowed for the return of capital to investors:

> Cliffs has experienced tremendous growth through M&A in recent years and, with that, has also acquired a diverse and strong pipeline of attractive organic growth projects. As a result, we are refocusing our strategic priority to execution. Cliffs has matured to a point where our strong financial profile and cash flow generation will allow us to increasingly return large amounts of capital to our shareholders, while at the same time, fund capacity expansions already underway in Eastern Canada and other geographies.

---

[2]     "M&A" refers to mergers and acquisitions.

58.     In the Company's March 14, 2012 press release, defendant Carrabba falsely stated that the Company's "strong financial profile and cash flow generation will allow us *to increasingly return large amounts of capital to our shareholders, while at the same time, fund capacity expansions* already underway in Eastern Canada and other geographies."  Similarly, during a conference call with investors on March 14, 2012, Carrabba stated that Bloom Lake was a "*premium asset,"* **given its** *"low-cost space for a production base*" and its "*rail and port infrastructure*."  As Carrabba put it: Bloom Lake gave the Company "an immediate 8 million ton footprint in this geography and a pathway to 16 million tons in 2013."

59.     Defendant Carrabba stated during Cliffs' March 14, 2012 conference call announcing the dividend increase that Bloom Lake was a "premium asset" given its "low-cost" production base and its "established rail and port infrastructure," among other things. During that same call, defendant Brlas stated that the dividend was "extremely sustainable" and was "tested [under] a wide variety of [iron ore] pricing scenarios over the coming years."  In fact, defendant Brlas expressed such confidence on the call that she told investors that the Company intended to grow the dividend going forward.

60.     The statements set forth above were materially false and misleading because under Defendants' direction and on their watch, there existed severe and undisclosed problems at Bloom Lake.  Such problems made it impossible to engage in low cost production at Bloom Lake and prevented the Company from funding Bloom Lake's expansion plans while maintaining the increased dividend.  Indeed, Defendants failed to disclose that they were encountering a raft of issues at Bloom Lake, including with its rail and port infrastructure, reliance on contract labor and a failure to efficiently manage the operation.  Defendants knew these problems would cause Bloom Lake's production costs to soar rather than decrease.  Further, Defendants were unable and failed

to adequately test the sustainability of the dividend, and as such, knew that the escalating costs at Bloom Lake meant that the dividend was not "extremely sustainable."

61.     Defendants also sought to persuade the market that the dividend increase correctly reflected the Company's cash position by falsely stating that the dividend had been "stress-tested" and that the Company's price modeling took into account the price of iron ore.  For example, during the March 14, 2012 conference call, defendant Brlas stated that the dividend had been "*tested [under] a wide variety of [iron ore] pricing scenarios over the coming years.*"

62.     Moreover, on the same call, Brlas publicly dismissed concerns that Cliffs' move to spot-pricing contracts affected the sustainability of the dividend, stating in relevant part:

> One of the things that we did was *a significant amount of analysis* over various periods of the cycle that we've seen and what we might expect in order to be comfortable that we are now at a size and a scale that *even over a variety of iron ore pricing scenarios, we're still comfortable with this dividend level*.

63.     Defendants Carrabba, Brlas, and Blake's plan to assuage investor concerns by raising the dividend was successful.  Following Defendants' March 13, 2012 announcement, numerous analysts recommended Cliffs' stock because of the Company's dividend increase and prospects for growth, noting that Cliffs was now in line with its peers.  For example, UBS reported on March 13, 2012: "We expect th[e] announcement [of the 123% dividend increase] to be *well received by investors as returning cash to shareholders* . . . . [Cliffs'] beefed up dividend will be among the highest in the metals & mining space (almost double S&P 500's 2.1% div yield) and may attract a new class of investor – also a positive."

64.     Analysts also accepted Defendants' assurances that Bloom Lake would generate sufficient cash to maintain the dividend and that the dividend had been tested.  For example, on March 14, 2012, Dahlman Rose & Co. reported: "*We believe that the dividend is sustainable even under somewhat lower iron ore prices*."  CIBC World Markets further stated on March 22, 2012:

"*We believe growth will come primarily from the newly acquired Bloom Lake mine*."

65.     As a result of Defendants' materially false and misleading statements and omissions on March 14, 2012, Cliffs' common stock closed at $69.50 per share, up 7% from the previous day's closing price of $64.91.  Cliffs' common stock continued to appreciate, closing at $72.00 per share on March 15, 2012.

66.     Defendants' initial statements about Bloom Lake and the dividend increased internal pressure to perpetuate the Company's lie that Phase 1 would generate enough cash-flow to fund the increased dividend, while simultaneously financing the capital-intensive Phase 2 expansion.  In actuality, and as discussed below, Bloom Lake was experiencing rampant shutdowns that prevented the mine from running efficiently and achieving its production rate of 8 million tons per year, and resulted in increased costs due to maintenance and repairs.  Bloom Lake also suffered from serious problems with its production and transportation infrastructure and with mismanagement and labor at the mine.  The combination of these issues made it impossible for Bloom Lake to achieve annual production of 8 million tons, or to reduce cash-per-ton costs to $60 in Phase 1.

67.     Nonetheless, and despite their knowledge or reckless disregard of systemic issues at Bloom Lake, Defendants omitted this material information and repeatedly misled investors to believe during the Relevant Period that Phase 1 was on track, concealing and minimizing the mine's problems.

68.     On April 25, 2012, after the close of the financial markets, Defendants released the Company's earnings for the first quarter of 2012 and on April 26, 2012 held its conference call to discuss those results.  During the call, Defendants announced increased costs at Bloom Lake, increased projected costs for full-year 2012 and reduced expected production volumes in the Eastern Canadian segment from 12.0 million tons to 11.2 million tons.

69.     In his comments made during the April 26, 2012 call, however, defendant

Carrabba failed to disclose the true nature or extent of Bloom Lake's problems, assuring investors that the improvements and expansions at the mine were being completed according to plan and were not encountering any serious difficulties.  Defendant Carrabba stated, in pertinent part:

> At quarter end, we were nearly complete with the design work to re-engineer our tailings management at Bloom Lake. Once a new design is implemented, it is expected to lower our future cash costs and will support our production expansion to 24 million tons per year. By improving ore recovery rates through blending and adjustments to the mine's flow sheet, we have increased Bloom Lake's production reliability. These are just two examples of how Cliffs is bringing its operating experience to bear on improving the long-term capabilities of the mine.
>
> \*   \*   \*
>
> I am also enthusiastic to report our expansion to 16 million tons at Bloom Lake is progressing well. Today, construction of Phase Two is nearly 30% complete, with engineering-related work approximately 80% complete. Additionally, we have secured a rail agreement with the QNS&L to support our expansion to 16 million tons annually. We anticipate finishing the scoping study at Bloom Lake's Phase Three expansion to 24 million tons by the end of the year.
>
> \*   \*   \*
>
> Candidly, we recognized cash costs of Bloom Lake are higher than expected. While this is not ideal, we have a plan in place to optimally run and expand its operation. Within this plan, we will continue to adjust the Phase One flow sheets until we are satisfied with the product's consistency and production of the reliability. In the shorter-term these adjustments could impact cost, as they did in the first quarter. Despite this, I believe our Phase One cash cost target of $60 per ton is still realistic and achievable. Better yet, we will apply the knowledge we've gained from Phase One to our Phase Two ramp up.

70.     Similarly, defendant Brlas stated that "we anticipate realizing significantly improved fixed cost leverage at Bloom Lake . . . [and] we expect to achieve $60 per ton cash cost at Bloom Lake in the latter half of 2012."  During the April 26, 2012 conference call, defendant Carrabba represented that "***we have increased Bloom Lake's production reliability***."  Moreover, Carrabba further stated that reduced costs were just around the corner, because the Company had "a plan in place" to lower the costs of, and capitalize on, Bloom Lake.  Relying on this "plan," Carrabba assured investors that "***our Phase 1 cash cost target of $60 per ton is still realistic and achievable***."

71.     The statements set forth above were materially false and misleading because

- 20 -

Defendants knew of severe and undisclosed problems at Bloom Lake.  Further, contrary to Defendants' statements that Bloom Lake's improvements and expansions were moving forward as expected ("progressing well"), they were, in fact, experiencing substantial setbacks that caused the mine's costs to remain elevated and production volume to remain flat or decrease.  Defendants also continued to conceal that Bloom Lake's cost and production problems were so serious that the Company's dividend was not sustainable, and that Cliffs was unable and failed to adequately test the dividend.

72.     With respect to the production issues and the increased costs in first quarter 2012, Carrabba falsely attributed these problems to a fire that caused a temporary shutdown, which he spun to Bloom Lake's advantage, stating that: "[While the fire had] resulted in production downtime of approximately 10 days . . . we used the downtime to advance planned maintenance, originally slated for the second quarter."  As a result, Carrabba stated: "By compressing maintenance planned for future quarters, we expect to recover some of the production loss throughout the remainder of the year."  Moreover, despite knowledge of numerous production problems during Cliffs' first year overseeing the operation and expansion of Bloom Lake, defendant Carrabba was emphatic in denying that there were problems at the mine: "We're very satisfied with the project we bought from Consolidated Thompson.  *We have not found any fatal flaws, if you will, or even major flaws in the flow sheet*."  By doing so, Carrabba misrepresented the true facts and omitted to disclose material information about the full scope of the production problems.

73.     Numerous analysts credited Carrabba's false explanation, along with Carrabba's false assurances that cash costs of $60 would still be achieved in Phase 1.  For example, RBC Capital Markets concluded on April 26, 2012: "Bloom Lake cash costs sky rocket due to fire, but expected to fall to average of $60/tonne in H2/2012."

- 21 -

74. In reality, the fire was a one-time event and not the sole cause of Bloom Lake's high production costs, which continued to increase throughout the Relevant Period, including in the quarters after the fire, due to systemic, undisclosed problems.

75. The statements above concerning increased costs and production issues at Bloom Lake caused the price of Cliffs' common stock to drop on April 26, 2012 from $67.11 per share to $63.54 per share, a decline of over 5%. But Defendants failed to disclose the seriousness and extent of the problems at Bloom Lake, continued to mislead the market concerning their inability to remediate the massive cost and production problems at the mine, and continued to conceal that the Company was unable to adequately test and maintain its dividend. Those material misrepresentations and omissions continued to affect the price of Cliffs' common stock.

76. On July 25, 2012, after the close of trading, Defendants issued a press release announcing the Company's earnings results for the second quarter of 2012, in which they reported higher than expected cash costs at Bloom Lake of $91 per ton on 1.4 million tons of iron ore and reduced the expected annual production of Bloom Lake's Phase 1 facility. The production volume reduction was ostensibly tied to production of a premium, higher-grade iron ore concentrate product. The press release stated, in relevant part:

> As part of a revised long-term commercial strategy for Bloom Lake Mine, Cliffs has recently made an operating decision to begin production of a premium, higher-grade iron ore concentrate product expected to realize a premium price and higher sales margin per ton in the seaborne iron ore market. The higher-grade iron ore product will be comprised of lower silica levels versus Bloom Lake Mine's previous product. Producing this premium product partially contributes to reducing Bloom Lake Mine's overall expected annual production volume to 7.2 million tons from a previous expectation of 8 million tons per year.

77. For example, during Cliffs' July 26, 2012 earnings conference call for second quarter 2012, defendant Carrabba misrepresented that Bloom Lake's higher costs were driven by Cliffs' purportedly strategic decision to produce a new "premium product" with a lower silica content. In

fact, as detailed below, Carrabba omitted that the iron ore's silica content was a serious production problem, resulting in, among other issues, equipment breakdowns and an unprecedented number of shutdown days, thereby contributing to Cliffs' inability to increase Phase 1 production or reduce costs.

78.     Nonetheless, Defendants continued to falsely assure investors that the Company would stabilize costs per ton at Bloom Lake to $60-65 in late 2012.  For example, Brlas stated: "The team remains confident that goal [of a cash-cost of $60-65 per ton in the last month of 2012] can be achieved."  After providing a detailed description of cost savings to be achieved from the mine's operations and equipment, including the tailings pond and dock, Carrabba reiterated: "[T]here is a plan on the cost reduction, *it's just not a wish and a hope, if you will*."

79.     Defendants also announced in the same press release that the Company was increasing its full-year 2012 cash cost per ton estimates for the Eastern Canadian business segment to $100-$105, up significantly from the $80-$85 per ton 2012 target that Defendants previously represented the Company would achieve.  Defendants further disclosed that for 2012 cash costs per ton would be $85 at Bloom Lake and $125 at Wabush.

80.     During the July 26, 2012 earnings conference call for the second quarter of 2012 Defendants discussed the reduction in Bloom Lake's annual production, and explained that Bloom Lake's higher costs were driven by higher labor, tailings management problems, and logistics costs.  In that regard, defendant Carrabba stated, in relevant part:

> During the quarter, we made a strategic decision to begin production of a premium, higher-grade iron ore concentrate product from Bloom Lake. The new product will contain a lower silica level of 4.5%. This compares to the mine's previous concentrate product, which contained a 5.5% silica level. . . .

> The process of adjusting the concentrator flow sheet to produce this lower-silica product impacts the overall iron ore recovery rate, which reduces the mine's production volume. The production of this premium product partially contributes to reducing Bloom Lake's overall expected annual production volume to 7.0 million tons from our previous expectation of 8 million tons. Additionally, the

- 23 -

lower annualized run rate is expected to increase the mine's operating stability. ***Ultimately, we believe this new product and revised annual production volume will increase the mine's long-term profitability. We also anticipate producing this type of product from the Phase 2 expansion, and therefore expect production volume of approximately 7.3 million-tons.***

81.    Again, Defendants failed to disclose the full extent and seriousness of the issues at Bloom Lake.  Indeed, Defendants maintained that under their direction and on their watch, the Company was continuing to increase operating stability at the mine, that the Phase 2 expansion was moving forward as planned, and that costs at the mine would stabilize at approximately $60-$65 per ton in late 2012.  Further, Defendants lowered Bloom Lake's production numbers because of problems at the mine – not to produce a higher-grade iron ore product.  Defendants made these false statements even though they increased the estimated full year 2012 cash costs at Bloom Lake just one day before.  During the July 26, 2012 conference call, defendant Carrabba falsely stated that cost savings could be achieved through a new sequencing in the mine, improved tailings management, and improved logistics "down at the dock":

> With that, the cost will come down from several different very large components. There is a new sequencing in the mine, particularly going to the western side, as we develop this mine and get more drill holes in it. . . .
>
> On the tailing side is the other big bucket. . . .when you do things like tailings pond management we're actually taking a step back and looking at the future and developing a tailings pond that can take additional tons. When we put that in later in this year and get the piping and the pumping that goes into the tailings ponds in, we'll eliminate all that labor and those contracts and trucks that are now trucking the material through. . . .
>
> The third big component is down at the dock. As you've heard reported by me earlier this morning, that's going very well. The cross conveyors are in. We're getting the ability to load both ships and we're -- we've got the ability now. We've moved that shipping from nine days to about 4.5 days and we're getting rid of the one of the two transloaders I think around the end of August or September, as well, so that'll lower our shipping cost that come in as well. And then if you will, as Bloom Lake phase 2 winds down later in the year and towards the start up in the first quarter, that confluence of contractors and that crossover of contractors and camp costs will go down. . . . there is a plan on the cost reduction, it's just not a

wish and a hope, if you will.

82.     At the same time, defendant Brlas (then Cliffs' CFO) dismissed an analyst's questions and concerns regarding the sustainability of Cliffs' dividend in spite of Bloom Lake's serious production and cost issues, saying, "[a]s I said a couple of times, we really pressure tested [the dividend] and believe that we can sustain this dividend under quite a few variations of pricing scenarios."  Defendant Carrabba reinforced that statement, stating:

> That's right. And I think you've to take – 2012 is a big transition year for us, particularly with the new assets at Bloom Lake, and as soon as we get those costs and get that operation stabilized in phase 2, the construction piece coming over that, I think you can see very clearly there's plenty of room for the dividend. And, again, I will continue, as Laurie will, to reassure everybody we didn't put this dividend on to take it off the table if things got tough. We've done it under a lot of different scenarios and *we continue to maintain that we can support that dividend*.

83.     While analysts expressed disappointment regarding the Company's second quarter 2012 results, Carrabba's assurances successfully convinced the market that Cliffs would still be able to achieve "steady-state costs [] in the $60-$65/tonne range," as reported by RBC analysts on July 26, 2012.

84.     On July 31, 2012, Defendants held an "Analyst and Investor Day" to highlight the Company's growth projects in Canada, including Bloom Lake.  During that conference, Defendants continued to falsely represent that costs in Phase 1 would be reduced to $60 per ton.  For example, defendant Brlas represented, "*[A]s we said last week, we expect our cash cost to settle out between $60 and $65*."  In response to an analyst asking, "[D]o you foresee any delays to getting to that $65 or could you end up at $80 for some reason or – ," defendant Blake reiterated, "*[N]o, I don't see it going to $85*."

85.     Defendants also falsely represented production conditions at Bloom Lake, including the quality of the mine's equipment and infrastructure.  For example, Blake represented that Bloom

Lake's concentrator (an extremely important machine that turns the raw material into iron ore concentrate) was "fantastic."  Blake stated, "We have an operating concentrator . . . . This is the future of concentrating."  Similarly with respect to the mine's transportation infrastructure, which enabled the transport of iron ore concentrate from the production site to trains and boats for sale to consumers, Blake stated that those facilities "are working quite well."

86.     Again, analysts reacted positively to these assurances.  For example, UBS reported on July 31, 2012 that Cliffs had a "very clear, detailed plan to reduce cash costs from $95/t to $63/t by the end of the year, much of which is attributed to improvements in vols."  Macquarie (USA) Research reported, after attending Cliffs' Investor Day: "We reiterate our [outperform] rating and [target price] of $61.  Following the visit, we are incrementally more positive that [Cliffs] can overcome cost issues at Bloom Lake during 2H2012 and we see currently elevated costs as temporary."

87.     In reality, Bloom Lake suffered from numerous, costly, undisclosed operational problems, including problems with the concentrator frequently breaking down, as well as frequent shutdowns of the rail track, which inhibited production and increased costs, rendering Phase 1's production volume and cash cost goal of $60-65/ton impossible.

88.     The statements set forth above were materially false and misleading because under Defendants' direction and on their watch, there existed severe and undisclosed problems at Bloom Lake.  Defendants reduced Bloom Lake's production volumes primarily because of problems at the mine – not because of a purported decision to produce a different grade of ore. Further, Defendants knew that the cost savings to be achieved through new sequencing, improved tailings management and logistics would be insufficient to control Bloom Lake's costs, particularly in light of problems with the very rail and port infrastructure that Cliffs purported would help it *reduce* costs.  Given the uncontrolled costs at Bloom Lake, including reliance on

contract labor and a failure to efficiently manage the operation, and the fact that the Company was unable and failed to adequately test the sustainability of the dividend, Defendants also knew that the dividend was not sustainable.

89.     The disclosures on July 25 and 26, 2012, concerning the cost and production issues at Bloom Lake, caused the price of the Company's stock to drop from $41.15 per share on July 25, 2012 to $38.57 per share on July 26, 2012, or over 6%.

90.     On July 31, 2012, Defendants held an analyst conference to specifically highlight the Company's growth and expansion projects in Canada, including Bloom Lake.  During that conference, defendant Carrabba stated that Bloom Lake is a "fantastic property," and that Cliffs is "stress testing our [iron ore pricing and dividend] models constantly."  Defendant Carrabba further stated that "no matter what stress tests you put in pricing right now, we're still in pretty good shape."  Additionally, defendant Brlas continued to falsely claim that Bloom Lake's cash costs would decrease to $60-$65 per ton, and reiterated that the Company's dividend is sustainable.  Defendant Brlas stated, in relevant part:

> As part of that work that we did, before we made that announcement, we did a great deal of pressure stress testing at iron ore prices certainly below what you're seeing today. We tested that against our investment grade rating, and we feel very strongly that that dividend announcement is something that we're committed to and that we're going to stay with. And that's an important part of our strategy going forward.

91.     Defendant Blake also stated that Bloom Lake's cash costs would not increase to $85, even if there are delays at the mine.  Further, defendant Blake misrepresented that the progress of Bloom Lake's Phase 2 expansion was proceeding according to plan, that one of its most important facilities, known as a concentrator, was "fantastic," and that the mine's port facilities were working well.  Defendant Blake stated, in relevant part:

> You could see here the construction of Phase[2]. Right now, we're expecting double production by the end of 2013, as Laurie pronounced. That construction is

going very well. . . .

And more importantly, we could have great ore resource, the fantastic concentrator. But without the ability to adequately ship on a consistent basis, all the above is not so valuable. So we do have a rail. We do have port facilities. They are working quite well. And I'll talk about some of the synergies we discussed and when we're going into the acquisition and what we're doing and why they're working today.

92.    The statements set forth above were materially false and misleading because Defendants failed to adequately test the Company's iron ore pricing models, and were unable and failed to adequately test the sustainability of Cliffs' dividend.  Further, the statements about Bloom Lake were materially false and misleading because Defendants knew of severe and undisclosed operational problems at Bloom Lake (which occurred under their direction and on their watch). Defendants' statements belied the existence of problems with Bloom Lake's concentrator and its rail and port infrastructure.

93.    On October 1, 2012, defendant Paradie took over as CFO for defendant Brlas, and Brlas became President of Global Operations.  On October 24, 2012, after the close of the market, the Company disclosed its results for third quarter 2012.  Bloom Lake's cash cost for the quarter was $88 per ton on 1.4 million tons of iron ore, nearly a third higher than the $60 per ton Defendants had repeatedly promised to investors.

94.    In addition, when the Company held its earnings conference call for third quarter 2012, the next day, defendant Carrabba announced that the Company had reduced its expected production volume in its Eastern Canadian business segment yet again "to approximately 8.9 million tons from our previous expectation of 9.2 million tons."  Nonetheless, defendant Paradie stated that, in only two months, Cliffs "expect[s] to exit the year producing at an annualized rate of *7.2 million tons* and *a mid-$60 cash cost per ton*."

95.    Again, analysts reacted positively to Defendants' assurances.  For example, on

October 25, 2012, Credit Suisse reported "[n]o change to Bloom Lake guidance" as a "key positive," noting that Bloom Lake's "dirty laundry" had been "air[ed]" in July/August.

96. But Defendants were still hiding much more dirty laundry. On November 19, 2012, Defendants publicly disclosed significant adjustments to the Company's 2013 operating plan, effectively admitting that the Bloom Lake project was encountering serious problems. Defendants reduced their estimates for annual production at Bloom Lake's Phase 1 facility from 7.2 million tons to 7.0 million tons, and as discussed below, suspended the Phase 2 expansion. Nonetheless, Defendants failed to disclose the full extent of the operational problems in Phase 1, falsely attributing the production decrease to "increased iron pre pricing volatility and lower Northern American steelmaking utilization rates." In reality Bloom Lake's inability to achieve its Phase 1 production goals was due to rampant operational problems that resulted in skyrocketing costs, not iron ore pricing volatility. Indeed, in November 2012, iron ore prices were rising and were no more volatile than at any other time during the Relevant Period.

97. On October 24, 2012, Defendants disclosed the Company's financial results for the third quarter of 2012. Bloom Lake's cash cost for the quarter was $88 per ton on 1.4 million tons of iron ore. On October 25, 2012, Defendants held an earnings conference call for the third quarter of 2012 during which defendant Carrabba announced that the Company had reduced its expected production volume in its Eastern Canadian business segment. He stated, in relevant part:

> While we continue to take steps to achieve operational stability at Wabush, in light of the current pricing environment, we are dedicating more of our Management and capital resources toward ramping up Bloom Lake's operations. Because of this, we are decreasing our expected production volume to approximately 8.9 million tons from our previous expectation of 9.2 million tons.

98. Still, during the October 25, 2012 conference call, Defendants continued to assuage investors' concerns about costs and expansion plans at Bloom Lake and represented that

Bloom Lake's Phase 2 expansion was making good progress.  According to defendant Carrabba:

> We continue to make progress on the construction of Bloom Lake's second phase. The concentrator is 60% complete and we are still on track to commence production during the first half of next year. With the ramp up in commercial marketing progress being made at Bloom Lake, we expect to sell approximately 13 million to 14 million tons from our Eastern Canadian Iron Ore operations in 2013.

99.    Defendants further represented that they were in a strong position to control costs at Bloom Lake and that the Company (under their direction and on their watch) was on-track to reach a mid-$60s per ton cash cost at the mine by the end of 2012.  Specifically, defendant Paradie stated, in pertinent part:

> Additionally, we continue to expect to exit the year producing at an annualized rate of 7.2 million tons and a mid-$60 cash cost per ton. We anticipate our average fourth-quarter cash cost to be approximately $76 per ton at Bloom Lake.

100.    The statements set forth above were materially false and misleading because Defendants knew that Bloom Lake's Phase 2 expansion was encountering significant setbacks and that the Company's mid-$60s cash cost estimate for Bloom Lake was not achievable. Defendants also continued to conceal the significant operational problems at Bloom Lake and that the Company's dividend was neither sustainable nor adequately tested.

101.    Notwithstanding Defendants' false assurances, the revelation of high costs and severe production issues at Bloom Lake caused the price of Cliffs' common stock to decline by $4.49 per share, from $42.69 per share on October 24, 2012 to $38.20 per share on October 25, 2012, or over 10%.

102.    Then, on November 19, 2012, less than a month after Defendants' assurances that the Phase 2 expansion was "on track," Defendants revealed significant adjustments to the Company's 2013 operating plan, effectively admitting that the Bloom Lake project was encountering serious problems.  These adjustments included a suspension of key components of

- 30 -

the Phase 2 expansion at Bloom Lake, such as delaying the completion of the concentrator and load-out facilities, and halting its exploratory study of Phase 3.  As a result of the delay of Bloom Lake's Phase 2 construction, Defendants decreased the Company's estimated Eastern Canadian Iron Ore sales volumes for 2013 from 13-14 million tons to 9-10 million tons.  Defendants also further reduced the Company's estimates for the annual production from Bloom Lake's Phase 1 facility from 7.2 million tons to 7.0 million tons.  The next day, Goldman Sachs cut its rating on Cliffs' stock from neutral to sell, citing Bloom Lake's expansion delay and high production costs, as well as concerns regarding the Company's ability to continue paying its dividend.  On this news, the price of Cliffs' stock dropped from $36.60 per share on November 19, 2012 to close on $30.48 per share on November 20, 2012, or over 16.7%.

103.    Defendants' November 19, 2012 disclosures failed to reveal the extent of the known operational problems at Bloom Lake or the unsustainability and lack of adequate testing of the dividend, and those misrepresentations and omissions continued to operate in the market.

104.    On February 12, 2013, Defendants filed with the United States Securities and Exchange Commission ("SEC") an annual report on Form 10-K (the "2012 10-K").  The 2012 10-K was signed (either directly or via the powers of attorney delegated to defendant Paradie) by defendants Carrabba, Paradie, Cunningham, Eldridge, Gluski, Green, Henry, Kirsch, Riederer and Sullivan.  In addition, the 2012 10-K contained certifications pursuant to the Sarbanes-Oxley of 2002 ("SOX Certifications"), signed by defendants Carrabba and Paradie, who stated:

I, [Joseph A. Carrabba/Terrance M. Paradie], certify that:

1. I have reviewed this annual report on Form 10-K of Cliffs Natural Resources Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not

misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

> (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

> (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

> (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

> (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

> (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

> (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control

over financial reporting.

*   *   *

In connection with the Annual Report of Cliffs Natural Resources Inc. (the "Company") on Form 10-K for the period ended December 31, 2012 as filed with the Securities and Exchange Commission on the date hereof (the "Form 10-K"), I, [Joseph A. Carrabba, Chairman, President and Chief Executive Officer of the Company/Terrance M. Paradie, Senior Vice President & Chief Financial Officer of the Company], certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that, to such officer's knowledge:

(1) The Form 10-K fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m or 78o(d)); and

(2) The information contained in the Form 10-K fairly presents, in all material respects, the financial condition and results of operations of the Company as of the dates and for the periods expressed in the Form 10-K.

## The Truth Begins to Emerge

105.    On February 12, 2013, after the close of trading, Defendants issued a press release announcing the Company's fourth quarter and full-year 2012 earnings results and disclosed that the Company would reduce its quarterly dividend by 76% to $0.15 per share.  Significantly, this announcement came less than one year after Cliffs' 123% dividend increase.  Not only did Defendants substantially cut the Company's dividend, but they also announced that they intended to raise approximately $900 million by offering nearly 9 million shares of common stock and 20 million depository shares for sale to the public.

106.    On the next day, February 13, 2013, defendant Carrabba stated on Cliffs' earnings conference call that the Company cut its dividend to maintain its investment grade credit rating, improve future free cash flow, and continue its growth projects.  Defendant Carrabba also announced that Bloom Lake's cash cost continued to soar at $86 per ton on 1.4 million tons of iron ore, due to higher fuel, contract labor, and maintenance supply costs.

107.    Defendant Paradie disclosed on the same conference call that Bloom Lake's per-ton cash cost was in the low $70's at year-end – higher than the targeted $60-$65 range, and further,

that Bloom Lake's cash costs would jump to $85-$90 in 2013.  According to Defendant Paradie:

> For the longer term, we continue to target a mid-$60 cash cost range, however, until both Phases are optimally producing at a targeted 14 million-ton run rate, we are increasing our targeted cash cost for Phase I to $70 to $75 per ton. We expect Bloom Lake's cash cost to include approximately $15 per ton of additional expenses related to mine development, stripping, and water management. With that, total cash costs at Bloom Lake are expected to be $85 to $90 per ton for 2013.

108.    Defendant Carrabba stated on Cliffs' earnings conference call that the Company had dramatically cut its dividend, attributing the decrease to the ongoing inability to generate a profit or reduce costs at Bloom Lake.  Carrabba stated, "[W]e recognize that Bloom Lake is taking longer to ramp-up than we originally expected.  This has directly impacted our profitability in the near term." Carrabba further stated that Bloom Lake's cash cost continued to soar at $86 per ton on 1.4 million tons of iron ore, due to higher fuel, contract labor, and maintenance supply costs.

109.    The news of the decreased dividend and the perpetual problems at Bloom Lake caused the price of Cliffs' stock to drop over 20.7%, or $7.59 per share, from $36.61 per share on February 12, 2013 to $29.02 per share on February 13, 2013.

110.    On March 27, 2013, before trading opened, Morgan Stanley and Credit Suisse severely cut their price targets on Cliffs' stock, citing a weak balance sheet, the potential need to sell core assets, structural changes in the Company's business and increased costs.  On this news, the price of Cliffs' stock declined from $21.43 per share on March 26, 2013, to $18.46 per share on March 27, 2013 or almost 13.9 %.

111.    Throughout the Relevant Period: (i) under Defendants' direction and on their watch, Bloom Lake's facilities had serious problems, including inadequate equipment and shipping facilities that were incapable of efficiently transporting iron ore products; (ii) Defendants knew that the mining operation of Bloom Lake would be more expensive than disclosed, including

that the production cost of iron ore per ton had increased and could not be decreased, as a result of the Company's reliance on contract labor and a failure to efficiently manage the operation; (iii) Defendants knew that production volumes at Bloom Lake had decreased rather than increased; (iv) Defendants knew that the Phase 2 and Phase 3 projects designed to increase production at Bloom Lake were not economically viable; (v) Defendants knew that as a result of the systemic and persistent problems at Bloom Lake, the Company's dividend was not sustainable; and (vi) Defendants did not and were incapable of adequately testing the dividend.

112.    On July 9, 2013, it was announced that defendant Carrabba had "retired" as Chairman of the Board. Carrabba also "retired" as President, CEO and a director of the Company effective November 15, 2013.  It was also announced on July 9, 2013 that defendant Brlas would "retire" and leave Cliffs immediately.  On August 21, 2013, it was announced that defendant Blake would "resign" effective October 31, 2013.

113.    In being allowed to leave the Company rather than being terminated for cause Carrabba, Brlas, and Blake would continue to receive benefits from the Company.

114.    The Company detailed the specifics of Carrabba's "separation agreement" in a Current Report on Form 8-K filed with the SEC on July 23, 2013.  By "retiring," Carrabba became entitled to receive certain benefits, including (1) a cash payment equal to the sum of two years of base salary and incentive bonus at target; (2) an additional cash payment related to a bonus for which he as eligible under the Company's Executive Management Performance Incentive Plan for 2013; and (3) continued coverage for medical benefits for Carrabba and his eligible dependents under the Company's health care plan for active employees.  Carrabba also received other compensation, including strategic initiative equity grants and a prorated portion of each of his restricted share unit awards and performance share awards in accordance with the terms of the

awards.    In addition, Carrabba was further entitled to receive benefits under the Company's retirement plan

115.    According to a Current Report on Form 8-K filed by the Company with the SEC on August 21, 2013 (the "August 21 8-K") Brlas was to "receive certain benefits" which included: (1) a cash payment equal to the sum of two years of her base salary and incentive bonus at target; (2) an additional cash payment related to the bonus for which Brlas was eligible under the Company's Executive Management Performance Incentive Plan for 2013; (3) continued coverage for medical benefits for Brlas and her family under the Company's health care plan for active employees up to the earlier of the second anniversary of her retirement, she fails to pay her share of the coverage costs or her death; and (4) twenty-four months of outplacement services.  Brlas, by resigning, further remained eligible, for a prorated portion of each of her restricted share unit awards and performance share awards as well benefits under the Company's retirement plan.

116.    According to the August 21 8-K Blake was to receive certain benefits including (1) a 10-month pro rata cash payment related to a bonus for which he was eligible under the Company's Management Performance Incentive Plan for 2013; and (2) continued coverage for medical benefits under the Company's health care plan for active employees up through December 31, 2013.

117.    Accordingly, as a result of Defendants' breaches, the Company has been damaged.

### THE SECURITIES CLASS ACTION

118.    The Securities Class Action is currently pending against the Company, Carrabba, Brlas, Paradie, and Blake.

119.    The Securities Class Action charges these defendants, based on similar allegations to those addressed herein, with violations of §10(b) and §20(a) of the Securities Exchange Act of

1934.

120.     On November 6, 2015 the Honorable Dan Aaron Polster of the United States District Court for the Northern District of Ohio denied the defendants motion to dismiss the second amended complaint in the Securities Class Action, therefore concluding that there was an indicia that the named defendants participated in a scheme to defraud investors.

121.     The Company would later announce in a February 7, 2016 press release that it had entered into an agreement in principle to resolve the Securities Class Action for $84 million.

## DERIVATIVE AND DEMAND ALLEGATIONS

122.     Plaintiff brings this action derivatively in the right and for the benefit of Cliffs to redress the breaches of fiduciary duty and other violations of law by Defendants.

123.     Plaintiff will adequately and fairly represent the interests of Cliffs and its shareholders in enforcing and prosecuting its rights.

124.     As a result of the allegations set forth herein, on May 30, 2014, Plaintiff issued the Demand pursuant to Ohio law on the Board to investigate and commence an action against certain current and/or former directors and executive officers of the Company (*i.e.* the defendants named herein).  A true and correct copy of the Demand is attached hereto at Exhibit A.

125.     It has now been over twenty-one months since Plaintiff issued the Demand and Plaintiff has received no substantive response whatsoever.

126.     Clearly, the Board's complete disregard of the Demand, which resulted in its functional refusal, is improper and demonstrates the Board's lack of diligence and good faith.

127.     Worse, in a February 7, 2016 press release, the Company announced that it had entered into an agreement in principle to settle the allegations herein through the State Derivative Actions.  Each plaintiff in the State Derivative Actions ran afoul of Ohio law by failing to make a

pre-suit demand on the Board.  The State Derivative Actions were stayed for nearly two years before the announcement of the proposed settlement.  Defendants must not be permitted to completely ignore the only shareholder to follow Ohio law.

128.    Thus, this shareholder derivative action should be allowed to proceed.

## COUNT I
### AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY FOR DISSEMINATING FALSE AND MISLEADING INFORMATION

129.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

130.    As alleged in detail herein, each of the Defendants (and particularly the Audit Committee Defendants) had a duty to ensure that Cliffs disseminated accurate, truthful and complete information to its shareholders.

131.    Defendants violated their fiduciary duties of care, loyalty, and good faith by causing or allowing the Company to disseminate to Cliffs shareholders materially misleading and inaccurate information through, *inter alia*, SEC filings and other public statements and disclosures as detailed herein.  These actions could not have been a good faith exercise of prudent business judgment.

132.    As a direct and proximate result of Defendants' foregoing breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

## COUNT II
### AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTIES FOR FAILING TO MAINTAIN INTERNAL CONTROLS

133.    Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

134.    As alleged herein, each of the Defendants had a fiduciary duty to, among other

things, exercise good faith to ensure that the Company's financial statements were prepared in accordance with GAAP, and, when put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

135.    Defendants willfully ignored the obvious and pervasive problems with Cliffs' internal controls practices and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

136.    As a direct and proximate result of the Defendants' foregoing breaches of fiduciary duties, the Company has sustained damages.

**COUNT III**
**AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTIES FOR FAILING TO PROPERLY OVERSEE AND MANAGE THE COMPANY**

137.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

138.    Defendants owed and owe Cliffs fiduciary obligations.  By reason of their fiduciary relationships, Defendants specifically owed and owe Cliffs the highest obligation of good faith, fair dealing, loyalty and due care.

139.    Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

140.    As a direct and proximate result of Defendants' failure to perform their fiduciary obligations, Cliffs has sustained significant damages, not only monetarily, but also to its corporate image and goodwill.

141.    As a result of the misconduct alleged herein, Defendants are liable to the Company.

142.    Plaintiff, on behalf of Cliffs, has no adequate remedy at law.

## COUNT IV
## AGAINST ALL DEFENDANTS FOR UNJUST ENRICHMENT

143.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

144.    By their wrongful acts and omissions, the Defendants were unjustly enriched at the expense of and to the detriment of Cliffs.

145.    Plaintiff, as a shareholder and representative of Cliffs, seeks restitution from these Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## COUNT V
## AGAINST ALL DEFENDANTS FOR ABUSE OF CONTROL

146.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

147.    Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Cliffs, for which they are legally responsible.  In particular, Defendants abused their positions of authority by causing or allowing Cliffs to misrepresent material facts regarding its financial position and business prospects.

148.    As a direct and proximate result of Defendants' abuse of control, Cliffs has sustained significant damages.

149.    As a result of the misconduct alleged herein, Defendants are liable to the Company.

150.    Plaintiff, on behalf of Cliffs, has no adequate remedy at law.

## COUNT VI
## AGAINST ALL DEFENDANTS FOR GROSS MISMANAGEMENT

151.    Plaintiff incorporates by reference and realleges each and every allegation set forth

above, as though fully set forth herein.

152.     Defendants had a duty to Cliffs and its shareholders to prudently supervise, manage and control the operations, business and internal financial accounting and disclosure controls of Cliffs.

153.     Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the businesses of Cliffs in a manner consistent with the duties imposed upon them by law.  By committing the misconduct alleged herein, Defendants breached their duties of due care, diligence and candor in the management and administration of Cliffs' affairs and in the use and preservation of Cliffs' assets.

154.     During the course of the discharge of their duties, Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet Defendants caused Cliffs to engage in the scheme complained of herein which they knew had an unreasonable risk of damage to Cliffs, thus breaching their duties to the Company.  As a result, Defendants grossly mismanaged Cliffs.

### COUNT VI
### AGAINST DEFENDANTS CUNNINGHAM, HENRY, ELDRIDGE, GAUMOND, GLUSKI, GREEN, KIRSCH, RIEDERER AND SULLIVAN FORBREACH OF FIDUCIARY DUTIES OF LOYALTY AND GOOD FAITH IN CONNECTION WITH CARRABBA AND BRLAS' "RETIREMENT" AND BLAKE'S "RESIGNATION"

155.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

156.     Each director on the Board was required to act with the utmost loyalty and good faith to the Company.  As alleged in detail herein, each director violated these core duties by

allowing Carrabba and Brlas to "retire" and Blake to "resign" and enter into the lucrative agreements with the Company even though the Board had grounds to terminate them for cause.

157. As a direct and proximate result of the Board's foregoing breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

## COUNT VII
## AGAINST DEFENDANTS CARRABBA, BRLAS, AND BLAKE FOR UNJUST ENRICHMENT IN CONNECTION WITH THEIR RESPECTIVE RETIREMENTS AND RESIGNATION

158. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

159. Because defendants Carrabba, Brlas, and Blake received valuable and lucrative benefits pursuant to their respective agreements with Cliff as part of either their "retirement" or "resignation" when each should have been terminated for cause, defendants Carrabba, Brlas, and Blakewere unjustly enriched at the expense of and to the detriment of Cliffs.

160. Plaintiff, as a shareholder and representative of Cliffs, seeks restitution from these Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A. Against all Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties;

B. Directing Cliffs to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not

limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board

      C.      Awarding to Cliffs restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Defendants;

      D.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

      E.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated:  February 19, 2016        **KARON LLC**

        By: */s/ Daniel R. Karon*
           Daniel R. Karon (#0069304)
           Beau D. Hollowell (#0080704)
           700 W. St. Clair Ave. Suite 200
           Cleveland, OH 44113
           Telephone:  (216) 622-1851

        **THE WEISER LAW FIRM, P.C.**
        Robert B. Weiser
        Brett D. Stecker
        James M. Ficaro
        22 Cassatt Avenue
        Berwyn, PA 19312
        Telephone:  (610) 225-2677
        Facsimile:  (610) 408-8062

        **RYAN & MANISKAS, LLP**
        Richard A. Maniskas
        995 Old Eagle School Road, Suite 311
        Wayne, PA 19087
        Telephone:  (484) 588-5516

Facsimile:  (484) 450-2582

Counsel for Plaintiff

## VERIFICATION

I, Joseph Mansour, under penalty of perjury, state as follows:

I am the Plaintiff in the above-captioned action. I have read the foregoing Complaint and authorized its filing. Based upon the investigation of my counsel, the allegations in the Complaint are true to the best of my knowledge, information and belief.

DATED: _2 -12 -16_

_____
Joseph Mansour